IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

TINA ROWELL, KAY KELLY,
CHERYL MARBERRY, and
DIANNE CHANEY

       Plaintiffs,

v.                                 No. 07-cv-1123

MADISON COUNTY, TENNESSEE,

       Defendant.

_____

ORDER GRANTING IN PART, DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
_____

Plaintiffs Tina Rowell, Kay Kelly, Cheryl Marberry, and Dianne Chaney[1] initiated this civil action against their former employer, Defendant Madison County, Tennessee ("County"), in state court. They alleged violations of the First Amendment to the United States Constitution; the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304; the Tennessee Public Employee Political Freedom Act ("TPEPFA"), Tenn. Code Ann. § 8-50-603; and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.* The Defendant removed the case to federal court pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1331 on the basis that the First Amendment retaliation claim presented a federal question, 42 U.S.C. § 1983. In this Court, Madison County filed a motion for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure,

_____

[1]This Court previously entered a judgment dismissing the claims of Kelly, Marberry, and Chaney with prejudice. (See D.E. 30.) Rowell is now the only remaining plaintiff.

1

as to all claims.  Upon consideration of the materials submitted by both parties, the Court GRANTS

in part, and DENIES in part the Defendant's motion.


FACTUAL BACKGROUND

The Jackson-Madison County Regional Health Department ("Health Department") formerly

employed Rowell as a public health nurse administrator, which was a grant-funded position.[2]

(Docket Entry ("D.E.") No. 1, Complaint, at ¶ 1; D.E. 22, Rowell Dep., at 35.)  On June 30, 2006,

the Health Department terminated her position, along with several others.  (D.E. 22, Def.'s St. of

Facts, at ¶ 36.)  The Defendant attributes these lay offs to budget concerns, but the Plaintiff claims

that her vocal opposition to a sabbatical leave agreement and her sex motivated her termination.

On November 30, 2005, Dr. Tony Emison, director of the Health Department, and Brent

Lewis, an environmental program director, signed a document entitled "Work Sabbatical

Agreement."  (D.E. 26, Ex. 6.)  This agreement permitted Lewis to reduce his normal work

requirements but receive full compensation and benefits from the Health Department while attending

Union University for twelve months to obtain a nursing degree.  (Id.)  Dr. Emison previously had

discussed implementing a general policy for sabbatical leave with Janice Kirk, the Health

Department's human resource analyst, and Jerome Teel, the County attorney, but an official policy

was never adopted by the Madison County Commission.[3]  (D.E. 26, Kirk depo., at 15; Teel depo.,

---

[2]The Defendant also employed Kelly as a family planning nurse administrator, Marberry as a family nurse practitioner, and Chaney as an administrative assistant.  (D.E. 22, Kelly depo., at 27; Marberry depo. at 33; Chaney depo. at 28.)  Marberry and Chaney were paid from the Health Department's general fund, while Kelly's position was funded by a grant.  (Id.)

[3]One Madison County employee handbook, which was published in May 18, 1998, contains policies for leave for jury and court duty, the Family Medical and Leave Act, voting,

at 24; Nichols depo, at 21-22.)  Teel had reviewed a draft of a work sabbatical agreement, though not the same document later signed by Dr. Emison and Lewis.  (D.E. 26, Teel depo, at 29.)  Teel approved the form presented to him, but he lacked the authority to adopt an official sabbatical policy.  (Id. at 24.)  Neither the County Commission nor other employees at the Health Department received actual notice of Lewis's sabbatical at that time.  (D.E. 26, Kirk depo., at 12, 24; Teel depo., at 24.)

Leanne Honeycutt, an administrative services assistant, received a copy of Lewis's sabbatical agreement and was informed that it would not be sent to the personnel director at the County courthouse.  (D.E. 26, Honeycutt depo., at 9-10.)  Honeycutt showed this agreement to her assistant, Chaney, who commented that the Health Department had no policy for sabbatical leave.  (D.E. 26, Chaney depo. at 59.)  Honeycutt and Chaney asked Dr. Emison how to incorporate the terms of the agreement into Lewis's time sheets, and he told them to treat Lewis as a full-time employee.  (D.E. 26, Honeycutt depo., at 10-11.)  Chaney thought these instructions constituted "falsifying time sheets" and were part of an illegal "under-the-table deal between [Dr. Emison] and . . . Lewis," but she did not express these views to Dr. Emison.  (D.E. 26, Chaney depo. at 64.)  Although Chaney

---

military service, injury in the line of duty, sickness, vacation, hardship, and death of an immediate family member.  (D.E. 26, Red Handbook, at 2-11.)  Sabbatical leave is not mentioned in this handbook.  (Id.)  Madison County also has a separate blue employee handbook, revised on September 1, 1991, that covers leave policy and likewise does not specifically discuss sabbatical leave, though it has a section entitled "Absence with Pay."  (D.E. 26, Blue Handbook, at 7-14.)  The "blue handbook" also contains a section entitled "Professional Development," which states, "A limited amount of time may be granted by Department Head to attend academic institutions of higher learning to help employees further their formal education and encourage high quality training."  (Id. at 6.)  "Department Head" is defined as a "person appointed who is responsible for administering the functions of a department."  (Id. at 22.)

agreed to write 7.5 hours per day on Lewis's time sheets,[4] she expressed disapproval about this arrangement with Kirk and other co-workers.  (Id. at 65)  Until the sabbatical agreement was later made public, however, she did not discuss it with anyone outside the Health Department.  (Id. at 76.)

Around March or early April 2006, the Tennessee Comptroller of the Treasury, Division of Audit Control, issued a report of audit findings related to Madison County.  (D.E. 22, Rowell depo., at 65.)  The local newspaper and talk radio covered these findings.  (Id.; Kelly depo., at 95-96; Marberry depo., at 63; D.E. 26, Broyles depo., at ¶ 3.)  The comptroller's report found that Lewis's sabbatical agreement did not comply with government auditing standards, noting specifically that "[t]he personnel policies adopted by the County Commission [did] not provide for sabbaticals for employees to continue their education."  (D.E. 26, Audit Findings.)  The report instructed that employee agreements must comply with approved County personnel policy.  (Id.)  In response, the Health Department management alluded to a unique need to train Lewis as part of the County's "bio-preparedness plan."  (Id.)  The comptroller's report reiterated that any sabbatical benefit program must be in accord with official policy adopted by the County Commission.  (Id.)

Rowell learned about the audit findings from her father, who was a County commissioner, as well as through the local newspaper and radio stations.  (D.E. 22, Rowell depo., at 65-66.)  Prior to publication of the audit findings, she had no knowledge of Lewis's sabbatical.  (D.E. 22, Def.'s St. of Facts, at ¶¶ 13-15.)  After release of these findings, Rowell, Marberry, and Kelly complained to their immediate supervisor and director of nursing, Barbara Medlin, that Dr. Emison planned to continue Lewis's sabbatical, despite the fact that they believed it to be illegal.  (D.E. 26, Medlin

---

[4]In deposition, Lewis stated that the 7.5 hours written on his time sheet were meant to reflect time spent "working and going to school."  (D.E. 26, Lewis depo., at 27.)

affid., at ¶ 4.)  Rowell expressed similar concerns to other members of the supervisory staff within the Health Department, as well as to some County commissioners.  (D.E. 26, Rowell depo., at 79-80, 83-84, 93-94; see also Rowell affid.)

On April 20, 2006, Dr. Emison held a brief staff meeting where he maintained that the sabbatical leave was legal, as it was approved by the County attorney, and would continue despite the comptroller's report.  (Id. at ¶ 5.)  He also instructed his staff not to discuss the matter with the media.  (D.E. 26, Kelly affid., at ¶ 4.)  Rowell attended this meeting and expressed a dissenting viewpoint.  (D.E. 26, Rowell depo., at 105.)  At the end of the meeting, Dr. Emison said that anyone who disagreed with his determination could resign.  (D.E. 26, Kelly depo., at 116, Medlin affid., at ¶ 5.)  According to Medlin, the sabbatical controversy caused a schism at the Health Department, with one group of employees fervently supporting Dr. Emison and another group, which included Rowell, believing the sabbatical policy was tantamount to a misappropriation of County funds. (D.E. 26, Medlin affid., at ¶ 6.)

On April 29, 2006, the District Attorney General for the district encompassing Madison County sent a letter to the County Mayor, stating that "[w]hile there is mismanagement and failures to conform to county policies and standard accounting principles, there are **NO** FINDINGS OF CRIMINAL FRAUD."  (D.E. 22, DA letter (emphasis in original).)  The letter also recommended that any further action regarding the audit findings be taken by the County Commission or County attorney.  (Id.)

On May 4, 2006, the County Commission held a special meeting.  (D.E. 26, Medlin affid., at ¶ 7.)  Several Health Department employees attended and wore buttons with the phrase "We

Support the Truth," which was meant to be understood as a show of support for Dr. Emison.[5]  (D.E. 26, Medlin affid., at ¶ 7,  Broyles affid., at ¶ 8.)  At some point after this meeting, Dr. Emison was overheard commenting to his supervisors that certain commissioners "were on a witch hunt and not supportive of the Health Department."  (D.E. 26, Medlin affid., at ¶ 10.)

On May 12, 2006, David Argo, who was the Sexually-Transmitted Disease ("STD") Director and a supporter of Dr. Emison, posted the following quotation on the bulletin board in the break room:

> If you work for a man, in Heaven's name, work for him.  If he pays you wages which supply you bread and butter, work for him; speak well of him; stand by him and stand by the institution he represents.  If put to a pinch, an ounce of loyalty is worth a pound of cleverness.  If you must vilify, condemn and eternally disparage–resign your position, and when you are outside, damn to your heart's content, but as long as you are part of the institution do not condemn it.  If you do that you are loosening the tendrils that are holding you to the institution, and at the first high wind that comes along, you will be uprooted and blown away, and probably will never know the reason why.[6]

(D.E. 26, Bulletin Board Post (footnote added).)  Argo later described this passage as a "poignant synopsis" of the conflict at the Health Department because he interpreted it to mean that "[i]f you

---

[5]Chaney attended the meeting but declined to wear a button.  (D.E. 26, Chaney affid. at ¶ 9.)  She later approached the County Mayor and reported that she had been falsifying Lewis's time sheets.  (Id. at ¶ 12.)

[6]The literary work from which this passage was taken is entitled "Get Out or Get in Line."  Selected Works of Elbert Hubbard, pp. 59-60 (1928).  The author, Elbert Hubbard, was an American essayist and publisher in the late Nineteenth and early Twentieth Century.  The Columbia Encyclopedia, (6th ed. 2001).  He was considered a proponent of the American Arts and Crafts Movement, which was an aesthetic movement that romanticized craftsmanship and personal handiwork.  John H. Martin, "Elbert G. Hubbard: Roycroft Arts and Crafts," The Crooked Lake Review, ch. 15 (Fall 2005), *available at* www.crookedlakereview.com.  Hubbard's most famous work was an essay entitled "A Message to Garcia," about an American military officer in Cuba during the Spanish-American War who obsequiously follows orders in the face of adversity–a didactic tale attributing moralistic value to duty and obedience.  The Columbia Encyclopedia, (6th ed. 2001).

can no longer believe in the organization that you're employed with or working for, then it's time to probably move on." (D.E. 26, Argo depo., at 25.) At Argo's request, Rowell read the posting, but she protested to its underlying sentiment, stating she could not "support someone who is defrauding the county." (D.E. 26, Rowell depo., at 125.)

According to Clinical Manager Shelby Broyles, on May 18, 2006,[7] Dr. Emison stated, at a supervisors' meeting, that he wanted to curtail negative talk about Lewis's sabbatical. (D.E. 26, Broyles affid., at ¶ 4.) He pointed his finger at Medlin and "told her that if she did not get her nurses [to stop] talking negatively about the sabbatical, then he would have her fired." (Id.) Medlin subsequently advised Rowell, along with Marberry and Kelly, that she had been instructed to terminate employees who vocally criticize the sabbatical policy at work. (D.E. 26, Medlin affid., at ¶ 13.) All three women expressed an unwillingness to acquiesce to Dr. Emison's orders, but Medlin did not terminate them because she was concerned about potential exposure to liability. (Id. at ¶ 14) On May 19, 2006, Chaney's supervisor also warned her that she would be written up and possibly fired if her criticism continued. (D.E. 26, Chaney affid., at ¶ 12; Chaney depo., at 121-22.)

In late May or early June 2006, the Madison County Budget Committee informed Sandra Hayes, the regional administrator of the Health Department, of the need to reduce the budget request by about $600,000 for the upcoming year. (D.E. 26, Hayes depo., at 5, 14; Nichols depo., at 20.) Hayes was advised to first "zero out the contracts that were over budget" by ensuring that the cost of running a grant-based program remained below or equal to the stated amount in the grant, thereby rendering the programs revenue neutral; although, she was never explicitly instructed to give

---

[7]Broyles's affidavit actually states the date as "May 18, 2008," but from the context, it appears this was a typographical error, and he actually meant 2006. (D.E. 26, Broyles affid., at ¶ 3.)

workers who were paid from general funds preference over grant-funded employees.  (D.E. 26, Hayes depo., at 18; Lowrance affid., at ¶¶ 7, 9.)  Hayes later determined that the family planning, immunizations, and STD programs were all running at a deficit.  (D.E. 22, Hayes depo., at 52.)

Around the third week in June, Argo, Dr. Emison, Hayes, and other supervisors had an informal discussion about budget cuts and the possibility of lay offs.  (D.E. 26, Argo depo, at 45-46.) On June 22, 2006, all the supervisors met for the purpose of considering personnel cuts.  (D.E. 22, Hayes depo., at 30.)  Dr. Emison's wife also attended this meeting, though she was not a Health Department or County employee.  (D.E. 26, Emison depo., at 117; Medlin affid., at ¶ 17.) According to Medlin, at the meeting, Dr. Emison asked "how well the nurses were liked in terms of their personalities."  (D.E. 26, Medlin affid., at ¶ 16.)  Argo then offered that Rowell and Kelly had been making negative comments about Lewis's sabbatical, which Medlin confirmed, and Dr. Emison's wife noted that they also had been speaking to various County commissioners and the press.  (Id. at ¶¶ 16-17; Argo depo., at 50, 52.)  Dr. Emison took handwritten notes at the meeting, and, next to Rowell's name, he wrote, "work hard–attitude poor, ? prob. will resign."[8]  (D.E. 26, Emison notes.)  The meeting concluded without the attendees reaching any final decisions as to which jobs would be eliminated.  (D.E. 26, Medlin affid., at ¶ 18.)  Sometime after the budget meeting, Hayes, Dr. Emison, and Kirk again met to discuss reductions in personnel, and Hayes recommended terminating certain employees, including Rowell.[9]  (D.E. 26, Hayes depo., at 57, 60-

---

[8]Adjacent to Kelly's name, Dr. Emison wrote, "non supportive attitude, negative critical person, neg. about life and work, hard worker, good worker;" beside Marberry's name, he wrote "works O.K., Cheryl - SLOW!"  (D.E. 26, Emison notes.)

[9]Hayes favored Kelly being cut because she was performing mostly family planning administrative duties with few clinical responsibilities, though her length of service was not considered in this decision.  Hayes also recommended that Marberry be released because she

61.)  By the end of June, all of the Plaintiffs were laid off, along with other full-time and part-time employees.  (D.E. 22, Marberry depo., at 117-19.)

On June 26, 2007, Rowell, Kelly, Marberry, and Chaney filed this action in state court.  The Defendant removed the action to this Court and later filed the instant motion.  Subsequent to the filing of this motion, the Defendant entered into a settlement agreement with Kelly, Marberry, and Chaney.  (D.E. 30, Order Dismissing Plaintiffs; D.E. 33, Judgment.)

## STANDARD OF REVIEW

Rule 56, Federal Rules of Civil Procedure, provides that

> judgment . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56©; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharms, Inc., 862 F.2d 597, 601 (6th Cir. 1988). In reviewing a motion for summary judgment, the Court views the evidence in a light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  When the motion is supported by documentary proof, such as depositions and affidavits, the nonmoving party may not rest on the pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 324; see also Abeita v. TransAmerica Mailings, Inc., 159 F.3d 246, 250 (6th Cir.1998).  It is insufficient for the nonmoving party "simply [to] show that there is some metaphysical doubt as to

---

was the least senior of the two non-state-employed nurse practitioners.  (Id. at 57-58.)  As well, Hayes recommended terminating Chaney.  (Id. at 60-61.)

the material facts." Matsushita, 475 U.S. at 586. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [an] asserted cause[] of action." Lord v. Saratoga Capital, Inc., 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989)). Finally, the "judge may not make credibility determinations or weigh the evidence." Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

ANALYSIS

I.      First Amendment Retaliation

Section 1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws." 42 U.S.C. § 1983. In order to prevail on such a claim, a plaintiff must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law." Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003). "Section 1983 is not the source of any substantive right, but merely provides a method for vindicating federal rights elsewhere conferred." Humes v. Gilless, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001). "It

10

is not enough for a complaint under § 1983 to contain mere conclusory allegations of unconstitutional conduct by persons acting under color of state law.  Some factual basis for such claims must be set forth in the pleadings."  Chapman v. City of Detroit, 808 F.2d 459, 465 (6th Cir. 1986).  Where, as in this case, the alleged violation is that "a government official retaliated against a plaintiff for exercising" First Amendment rights, which is commonly referred to as a First Amendment retaliation claim, the second element of a § 1983 action can be broken down into three sub-elements: The Plaintiff must prove (1) that she engaged in constitutionally-protected conduct; (2) the Defendant, under color of state law, took an adverse action against her, which "would deter a person of ordinary firmness from continuing to engage in that conduct;" and (3) the Defendant was motivated, at least in part, by her constitutionally-protected conduct.  Mezibov v. Allen, 411 F.3d 712, 717 (6th Cir. 2005).

A.      Final Policymaker[10]

The Defendant first argues that Plaintiff failed to plead that Dr. Emison or Hayes were final policymakers with authority to terminate Rowell.  It also contends that no official policy adopted by Madison County violated the Plaintiff's constitutional rights.  The Plaintiff responds by arguing that the facts pleaded and evidence presented sufficiently establish that an official under the color of Madison County's authority retaliated against her.

The United States Supreme Court has held that Congress did not intend municipalities to be liable under § 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort."  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed.

---

[10]The need to show that the disputed action was made by a final policymaker arises from the requirement that the injury be causally linked to an official "acting under color of state law." Mezibov, 411 F.3d at 717; Wittstock, 330 F.3d at 902.

2d 611 (1978).  In other words, the doctrine of respondeat superior does not apply to local county governments in these types of cases.  Id.  Thus, Rowell must show that her injury resulted from "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  Id. at 964.  While state authority may be delegated, the "mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials."  Miller v. Calhoun County, 408 F.3d 803, 814 (6th Cir. 2005) (quoting Feliciano v. City of Cleveland, 988 F.2d 649, 655 (6th Cir. 1993)).  Generally, "whether an official had final policymaking authority is a question of state law," which would include state "statutes, ordinances, and regulations, and less formal sources of law such as local practice and custom."  St. Louis v. Praprotnik, 485 U.S. 112, 124, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988); Feliciano, 988 F.2d at 655.  In determining who is a final policymaker, the Court will consider whether an official "formulates plans for the implementation of broad goals."  Miller, 408 F.3d at 814 (quoting Hager v. Pike County Bd. of Educ., 286 F.3d 366, 376 (6th Cir. 2002)).

The Court finds that the Plaintiff has presented sufficient evidence to establish Dr. Emison's actual policymaking authority.  Dr. Emison was the health director for the Madison County Health Department, and Tennessee law provides that "a county health department . . . shall be headed by, and under the immediate direction of, a county health director."  Tenn. Code Ann. § 68-2-603(a)(1).  The health director "act[s] as the administrative officer of the county health department."  § 68-2-603(a)(2).  Dr. Emison was appointed to this position by the Commissioner of Health in concurrence with the County Mayor and confirmed by the County Commission.  § 68-2-603(a)(1),

(6).  Further, the Madison County Employee Handbook provides that the "Department Head . . . is responsible for administering the functions of a department."  Considering that this proof suggests Dr. Emison had the authority to fire employees as part of his administrative duties, and the Defendant has offered no evidence refuting that he had such authority, the Court finds a material issue of fact as to whether he was a final policymaker for the purpose of supporting a § 1983 action against Madison County.

    B.    Whether Plaintiff Satisfied the <u>Pickering</u> Balancing Test

    Because Rowell was a public employee, she must satisfy a two-part balancing test[11] in order to establish that her speech was a constitutionally protected activity.  <u>Adair v. Charter County of Wayne</u>, 452 F.3d 482, 492 (6th Cir. 2006).  First, her speech must have touched on matters of public concern.  <u>Strouss v. Mich. Dep't of Corr.</u>, 250 F.3d 336, 345-46 (6th Cir. 2001).  Second, she must demonstrate that her interest "in commenting upon matters of public concern" outweighed the "interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  <u>Id.</u> (quoting <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 568, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968)).

    The Defendant argues that Rowell's speech did not further public interests because the

---

[11]This test is sometimes referred to as having three elements, with the third part being "whether the employee's speech was a substantial or motivating factor in the employer's decision to take the adverse employment action against the employee."  <u>Rodgers v. Banks</u>, 344 F.3d 587, 596 (6th Cir. 2003) (citing <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977)).  However, this "third prong" is the same as the element of causation in all First Amendment retaliation claims, regardless of whether the Plaintiff is a public employee.  <u>Mezibov</u>, 411 F.3d at 717.  The other two prongs–that the speech involves matters of public concern and outweighs other interests of the employer–are special requirements that public employees must meet in order to establish the first element of a First Amendment retaliation claim–i.e. a constitutionally protected activity.  <u>Id.</u>

sabbatical controversy was already well-known at the time she protested.  It also contends that her speech only concerned internal policies of the Health Department and the management style of Dr. Emison, and the disruption caused by her discussions undermined the employer's ability to maintain a proper working environment to the extent that it outweighed any interest promoted by her speech. In response, Rowell maintains that the topic of the sabbatical policy amounted to a matter of public concern because it involved the mismanagement and misappropriation of state funds, and the average taxpayer and citizen has a vested interest in issues of state finance.  Also, the Plaintiff asserts that her conduct was not prohibitively disruptive of Health Department business, considering that she never shouted, refused to work, refused to serve patients, or engaged in civil disobedience beyond mere words.

For the first prong of the balancing test, the Court considers whether Rowell's speech relates "to any matter of political, social, or other concern to the community."  Connick v. Myers, 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983).  This requires consideration of "the content, form, and context of a given statement, as revealed by the whole record."  Id. at 147-48.  The Sixth Circuit has noted that matters of public concern may involve "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government."  Brandenburg v. Hous. Auth. of Irvine, 253 F.3d 891, 898 (6th Cir. 2001) (quoting McKinley v. City of Eloy, 705 F.2d 1110, 1114 (9th Cir. 1983)).  This includes "informing the public that a governmental entity failed to 'discharge its governmental responsibilities' or 'bringing to light actual or potential wrongdoing or breach of public trust [on the part of a governmental entity or any officials therein].'"  Rodgers, 344 F.3d at 596 (quoting Connick, 461 U.S. at 148) (alterations in original).  When an employee's actions can be characterized as

14

"speaking as a citizen," rather than complaining as part of an internal personnel dispute, this weighs in favor of finding a matter of public concern. <u>Rodgers v. Banks</u>, 344 F.3d 587, 596 (6th Cir. 2003) (citing <u>Connick</u>, 461 U.S. at 146-47; <u>Brandenburg</u>, 253 F.3d at 898); <u>see also</u> <u>Jackson v. Leighton</u>, 168 F.3d 903, 910-11 (6th Cir. 1999) (indicating that a "quintessential employee beef" about the management falls beyond the scope of public concern).

In this case, the speech at issue concerned allocation of Health Department funds toward another employee's sabbatical, and the complaints were directed at supervisors and members of the County Commission. Rowell expressed concerns about "misappropriation" of taxpayer money, as well as suspicions that Dr. Emison was "defrauding the county." (D.E. 26, Rowell depo., at 125.) The controversial sabbatical did not directly affect Rowell personally. According to her, a concern over the waste of state resources supplied her primary motivation in speaking out. The topic of government spending is uniquely public in nature. Courts have noted that "the mismanagement and misappropriation of public monies can be a matter of public concern." <u>Wooley v. Madison County</u>, 209 F. Supp. 2d 836, 843 (W.D. Tenn. 2002). "'Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law,' when 'exposing graft and corruption,' and when 'seeing that public funds are not purloined' or wasted." <u>Id.</u> (quoting <u>Chappel v. Montgomery County Fire Prot. Dist. No. 1</u>, 131 F.3d 564, 576 (6th Cir. 1997); <u>Marohnic v. Walker</u>, 800 F.2d 613, 616 (6th Cir. 1986)). The Defendant's point–that the sabbatical agreement had been discussed in the newspapers and on the radio–if relevant at all, only highlights the public concern surrounding this topic. Also, that Rowell's speech addressed internal Health Department policies and the management style of Dr. Emison does not necessarily reflect the absence of public interest. The way a department head interacts with his staff on an interpersonal basis is generally

an internal matter, but public interest attaches when the department head makes decisions about expenditures of state funds.  No doubt, office politics played some part in escalating this overall conflict, but the interests underlying the Plaintiff's speech at issue in this case stretched beyond the walls of the Health Department.  After examining the content of the speech and the context in which it was spoken, the Court agrees that its subject matter involved public concern.

Next, the Court undertakes the balancing portion of the Pickering test, which is whether the interest promoted by commentary on public matters outweighs the interest of the employer in "promoting the efficiency of the public services."  Pickering, 391 U.S. at 568.  In making this determination, the Court focuses on the effects of Rowell's comments, including whether they "meaningfully interfere[d] with the performance of her duties, undermine[d] a legitimate goal or mission of the employer, create[d] disharmony among co-workers, impair[ed] discipline by superiors, or destroy[ed] the relationship of loyalty and trust required of confidential employees." Williams v. Kentucky, 24 F.3d 1526, 1536 (6th Cir 1994).  Other relevant factors are the "the manner, time, and place of the employee's expression," and "the context in which the dispute arose." Rodgers, 344 F.3d at 601 (citing Rankin v. McPherson, 483 U.S. 378, 388, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987)).  The Defendant bears the burden of justifying its employment decisions, which it may attempt to do through presentation of "evidence of the impact of the statement on the [County's] legitimate organizational interests." Meyers v. City of Cincinnati, 934 F.2d 726, 730 (citing Rankin, 483 U.S. at 388).

The County claims that speech concerning Lewis's sabbatical and the resulting audit findings created a "disruption in the workplace."  (D.E. 22, Def.'s Mot for S.J., at 21.)  It does not specifically expound upon how these discussions interfered with Health Department operations, but

16

it points to the depositions of Dr. Emison, Chaney, Rowell, and Kelly.  In Dr. Emison's deposition, he stated that he prohibited talk about the audit findings because of disruption in the workplace, though he did not allude to Rowell's comments specifically.  (D.E. 22, Emison Dep, at 90.)  Chaney noted that the "building was in an uproar" after the release of the audit findings and "there were news people standing outside."  (D.E. 22, Chaney Dep., at 107.)  Rowell acknowledged that the comptroller's report was negatively affecting morale, and Kelly believed it had caused "a lot of tension."  (D.E. 22, Rowell Dep., at 81; Kelly Dep., at 108.)  This deposition testimony reflects "disharmony among co-workers" over the topic of Lewis's sabbatical, Williams, 24 F.3d at 1536, but the portions cited by the Defendant contain no mention of Rowell's particular expressions. Rather, the deponents generally observed that conversations among all employees attributed to a tumultuous atmosphere within the Health Department.  They further reveal that the initial catalyst was the report released by the comptroller, and nothing indicates that Rowell was the affirmative cause of the controversy.  See id. (stating that the Pickering balancing test focuses on "the disruption resulting from the speech itself, not other events") (citing Solomon v. Royal Oak Township, 842 F.2d 862, 866 (6th Cir. 1988)).  Even assuming Rowell discussed the audit with her co-workers, the Defendant has offered no evidence that her speech was different in kind or degree from that of other employees, which undermines Dr. Emison's justification in singling her out for termination. Further, the Defendant has not shown that the Plaintiff's complaints to the County officials somehow disrupted the ability of the Health Department to provide public services, and this particular activity carries great weight in the Constitutional balancing test–as it is doubly protected in the First Amendment by the rights to "freedom of speech" and to "petition the Government for a redress of

17

grievances."[12]  U.S. Const. amend. I.

Overall, the Defendant has offered minimal evidence to show that Rowell somehow undermined its ability to provide efficient public services.  To the extent that the parties' interests were countervailing, the Court concludes that the Plaintiff's interest in commenting on matters of public concern would prevail under the circumstances presented.  Thus, Rowell has satisfied the Pickering test and established that she engaged in constitutionally protected conduct.

      C.      Whether Rowell's Termination Was Motivated by Her Constitutionally-Protected Conduct

Finally, the Defendant points to the Health Department's excess operational costs as evidence that Rowell's speech was not the motivating cause of her lay offs.  It argues that, regardless of her outspokenness, the Defendant would still have had to cut its budget.  In response, Rowell points to the following evidence that tends to show retaliatory intent behind Dr. Emison's decision to fire her:  During the April 20 staff meeting, Dr. Emison declared that Lewis's sabbatical would continue, instructed the staff not to discuss the matter, and stated than anyone who disagreed could resign.  After attending a special County Commission meeting on May 4, Dr. Emison commented that some of the commissioners seemed to be "on a witch hunt and not supportive of the Health Department."  On May 18, Dr. Emison instructed his supervisors to warn and possibly fire employees criticizing his resolution as to the sabbatical.  At the June 22 meeting, the controversy surrounding the sabbatical agreement came up, and Dr. Emison noted that some of the employees

---

[12]Also, the Tennessee General Assembly recognized that the State's interest in maintaining a productive working environment is, in some circumstances, outweighed by the "employee's right to communicate with an elected public official," when it codified a cause of action to protect this right.  Tenn. Code Ann. § 8-50-603.

who had previously criticized him were negative and had a poor attitude. Also, the Health Department had over $500,000 in reserve funds at the time the budget cuts were made, and other employees, such as Hayes and Kirk, received an increase in salary. Finally, the Plaintiff points to the temporal proximity between the complaints and the lay offs.[13]

Looking at the totality of this evidence, a reasonable juror could conclude that the budget excuse offered by the County was a pretext or that retaliatory motives also played a part in the employment decision. Thus, the Court finds a triable issue of fact as to whether Rowell's protected activities were a "substantial or motivating factor" in the Defendant's decision to terminate her. Rodgers, 344 F.3d at 601. Although the Defendant advocates the opposite conclusion, Rowell has presented evidence that, when taken in a light most favorable to her position, would establish facts from which a reasonable juror could infer a retaliatory motive. Liberty Lobby, 477 U.S. at 252.

II.   Rowell's Whistleblower Claim

In 1990, the Tennessee General Assembly enacted the Public Protection Act, which is commonly known as Tennessee's "whistleblower" statute. Tenn. Code Ann. § 50-1-304; Mason v. Seaton, 942 S.W.2d 470, 475 (Tenn. 1997). This statute provides a cause of action for employees, including state workers, who are terminated "solely for refusing to participate in, or for refusing to

---

[13]The Plaintiff offers much of this same evidence to establish causation in her state whistleblower claim. Speech that qualifies for protection under the TPPA would likewise be a matter of public concern because whistleblowing activity in Tennessee necessarily involves reporting a violation, or reasonably perceived violation, of a law "intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(a)(3). However, the standards differ somewhat with regard to the issue of causation. The burden of showing causation is less demanding under § 1983 than the Tennessee whistleblower statute because the Plaintiff need only show that her protected activities were a "substantial or motivating factor," instead of the sole motivation. Rodgers, 344 F.3d at 601; Guy v. Mut. of Omaha Ins. Co., 79 S.W.3d 528, 537 (Tenn. 2002).

remain silent about, illegal activities."[14]  Tenn. Code Ann. § 50-1-304(b), (d)(1).  Courts interpreting

the TPPA have determined that a plaintiff must prove four elements in order to establish a prima

facie case:

> (1) the plaintiff's status as an employee of the defendant;
> (2) the plaintiff's refusal to participate in, or to remain silent about, illegal activities;
> (3) the employer's discharge of the employee; and
> (4) an exclusive[15] causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee.

Wooley v. Madison County, 209 F. Supp. 2d 836, 845 (W.D. Tenn. 2002) (footnote added); Griggs

v. Coca-Cola Employees' Credit Union, 909 F. Supp. 1059, 1063 (E.D. Tenn. 1995).  An employer

may rebut the fourth element of a plaintiff's prima facie case by providing a "legitimate, . . . reason

for the employee's discharge."  Guy v. Mut. of Omaha Ins. Co., 79 S.W.3d 528, 537 (Tenn. 2002)

(quoting Anderson v. Standard Register Co., 857 S.W.2d 555, 559 (Tenn. 1993)).  If this occurs, the

burden then shifts back to the employee to show that the employer's explanation is a pretext for the

actual improper reason.

    A.      Illegal Activities

---

[14]The General Assembly took this language primarily from a decision of the Tennessee Supreme Court decided the previous year, which involved a common law claim for retaliatory discharge under facts similar to a whistleblower scenario.  See Watson v. Cleveland Chair Co., 789 S.W.2d 538, 540 (Tenn. 1989) (holding that a claim for retaliatory discharge arises "when an at-will employee is terminated solely for refusing to participate, or remain silent about illegal activities").  The state supreme court later held that § 50-1-304 did not preempt the common law cause of action.  Guy, 79 S.W.3d at 537 (stating that the TPPA is "cumulative to, and does not preempt, the common law tort remedy for retaliatory discharge claims").

[15]The exclusive causation requirement arises from the legislature's use of the adverb "solely" to modify "refusing" in the statute.  Tenn. Code Ann. § 50-1-304(b).  This statutory requirement differs from the elements for the common law action of retaliatory discharge, which is satisfied by proving that the whistleblowing activity was a "substantial factor" in the employee's discharge.  Guy, 79 S.W.3d at 537.

"Illegal activities," as the term is used in the TPPA, are actions committed "in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(a)(3). To establish a prima facie case, the Plaintiff need not necessarily establish that the illegal activities actually occurred. Instead, she may show that she had a "reasonable cause to believe a law, regulation, or rule [had] been violated or [would] be violated, and in good faith report[ed] it." Mason, 942 S.W.2d at 472 (citing Melchi v. Burns Int'l Sec. Serv., Inc., 597 F. Supp. 575, 583 (E.D. Mich. 1984)).

The Defendant contends that the Plaintiff has not established any "illegal activity," as defined by the whistleblower statute. Griggs, 909 F. Supp. at 1063. It argues that Rowell has not pointed to a statute or regulation that was violated, and, in fact, the state district attorney determined that there had been no criminal fraud. (D.E. 22, DA letter.) Alternatively, the Defendant asserts that, even if the sabbatical agreement had not been authorized by the County Commission, such a violation would not affect "public health, safety or welfare," as required by statute.[16] Tenn. Code Ann. § 50-1-304(a)(3). In response, the Plaintiff points to four sources of law, which she claims affected the public welfare and which she reasonably thought had been violated by Dr. Emison and Lewis.

Initially, Rowell cites to portions of the Tennessee Code that control written personnel policies of local governments. These statutes mandate that "[t]he county legislative body shall either approve or disapprove [base personnel policies] as a whole. If the policies are not approved, they

---

[16]The County also asserts that the Tennessee Supreme Court requires that the reported activity violate clear public policy. Tennessee courts have indicated that, whether a claim is brought under the statute or common law, the whistleblower's actions should have sought "to further the public good." Guy, 79 S.W.3d at 537 n.4 (quoting Wagner v. Globe, 722 P.2d 250, 257 (Ariz. 1986)).

shall be returned to the originating person or group for revision and resubmission to the county

legislative body."  Tenn. Code Ann. § 5-23-103(d)(6); see also Wooley, 209 F. Supp. 2d at 846

(indicating that the Madison County employee handbook states the base policies regarding leave).

Modifications to personnel policies must be adopted through the same procedure.  § 5-23-106.  The

statute also directs that approved polices be filed with the county clerk and that the department head

distribute copies to employees.  § 5-23-103(7), -107(1).  Required base personnel policies include

"annual leave, sick leave, or other leave."  § 5-23-104(1).  With regard to the legislative intent

behind these statutes the General Assembly codified the following:

> It is the legislative intent that all counties in this state have certain minimum written personnel policies in effect in order to assist in maintaining compliance with applicable state and federal laws and to facilitate accurate recordkeeping.  This chapter is not intended to affect the present authority within counties to adopt policies in addition to those required by this chapter, nor is it intended to enlarge, diminish or otherwise affect the obligation to comply with current state and federal laws governing personnel matters.  Nothing in this chapter shall be construed to impose any liability on any county government for failure to have written personnel policies in place, except as may be otherwise specifically provided by law.

Tenn. Code Ann. § 5-23-101 (emphasis added).  The explicit purposes of the statutory chapter relied

on by the Plaintiff are to promote compliance and accurate record keeping by local government.

While the general policy goals behind these statutes may promote efficiency in local governance,

the General Assembly apparently did not intend for them to affect public welfare directly, which

gives credence to the conclusion that reporting violations of these statutes would not fall within the

protection of the Tennessee whistleblower statute.  Also, the Plaintiff argues that Madison County

violated these sections because Dr. Emison, as department head, implemented a policy regarding

sabbatical leave without approval from the County's legislative body.  The specific provisions that

the Plaintiff alleges were violated, however, concern requirements imposed upon the County

legislature, not County officials.  Under a fact pattern analogous to this case, a trial court from this district noted that even though a county employee allegedly "violated Madison County's personnel policies as stated in the Madison County Employee Handbook," the plaintiff presented no proof that the county failed "to have base personnel policies governing paid leave."  Wooley, 209 F. Supp. 2d at 846.  This suggests that a county complies with these statutory sections merely by adopting the required base personnel policies, even when a supervisor later departs from such policies.  The Court agrees with that interpretation, and Rowell has presented no evidence establishing that Madison County failed to implement mandatory base policies.  (See D.E. 26, Red Handbook, at 2-11; Blue Handbook, at 7-14.)

Next, the Plaintiff points to the offense of "official misconduct," which is a Class E felony defined as follows:

> (a) A public servant commits an offense who, with intent to obtain a benefit or to harm another, intentionally or knowingly:
> (1) Commits an act relating to the servant's office or employment that constitutes an unauthorized exercise of official power;
> (2) Commits an act under color of office or employment that exceeds the servant's official power;
> (3) Refrains from performing a duty that is imposed by law or that is clearly inherent in the nature of the public servant's office or employment;
> (4) Violates a law relating to the public servant's office or employment; or
> (5) Receives any benefit not otherwise authorized by law.

Tenn. Code Ann. § 39-16-402.  One of the stated objectives of the Tennessee criminal code is to "prevent conduct that unjustifiably and inexcusably causes or threatens harm to individual, property, or public interest for which protection through the criminal law is appropriate."  Tenn. Code Ann. § 39-11-101.  Further, the Tennessee Constitution requires that all criminal indictments conclude with the phrase "against the peace and dignity of the State."  Tenn. Const. Art. VI, § 12; see also

State ex rel. Thompson v. Reichman, 188 S.W. 597, 602, 135 Tenn. 685, 705 (1916) (stating that "every indictable offense shall be regarded as against the peace of the State"). Considering this, the Court agrees that the statute criminalizing official misconduct, like other felonies, was intended to protect public welfare, and commission of this crime falls within the scope of "illegal activity" in Tennessee's whistleblower statute.

The Plaintiff argues that she reasonably believed Dr. Emison committed official misconduct by paying Lewis a full salary to attend college. (D.E. 26, Pl.'s Mem. of Law, at 21.) In particular, Rowell thought that the sabbatical agreement constituted an "'under the table' payment to Brent Lewis by Dr. Emison with money that did not belong to either of them." (D.E. 26, Rowell affid., at ¶ 10.) Additionally, Medlin confirmed that Rowell did not believe the sabbatical agreement was legal and she "felt quite strongly that Dr. Emison had misappropriated County funds and been caught in a cover-up." (D.E. 26, Medlin affid., at ¶¶ 4-6.) This evidence establishes the Plaintiff's subjective belief that Dr. Emison committed acts of official misconduct, such as exceeding his official power with intent to benefit.[17] Tenn. Code Ann. § 39-16-402. Whether her belief was supported by reasonable cause is a separate question, which depends upon the surrounding circumstances from which her suspicions arose. To establish the reasonableness of her belief, Rowell points to evidence showing that Dr. Emison never submitted the sabbatical agreement to the County Commission for approval or filed it with the personnel director at the County courthouse, his refusal to end the sabbatical after the report from the comptroller, the arguable inaccuracies

---

[17]The Plaintiff argues that the element of "intent to obtain a benefit" includes benefits obtained for others, such as Lewis in this case. Tenn. Code Ann. § 39-16-402. Because this issue focuses on the Plaintiff's honest and reasonable beliefs that a crime occurred, Mason, 942 S.W.2d at 472, the Court need not express any opinion with regard to whether her statutory interpretation is correct.

reported on the time sheets, and the fact that the sabbatical policy seemingly benefitted only one employee.[18]  From this, the Court finds sufficient evidence to create a genuine issue of material fact as to whether the Plaintiff had reasonable cause to believe illegal activity had occurred.[19]  Mason, 942 S.W.2d at 472.

> B.    Whether Rowell Actually Reported Illegal Activities

The Defendant argues that the Plaintiff's actions did not constitute whistleblowing because she merely complained about a situation that was already known by the general public.  Specifically, Rowell did not learn about the sabbatical agreement until the comptroller's audit findings were released and discussed by local newspapers and radio programs.  Thus, the Defendant insists that the Plaintiff never "blew the whistle" because she did not report new factual information that was not already widely available.  Rowell, on the other hand, points out that the language of the statute merely provides that an employee cannot be discharged "for refusing to remain silent about[] illegal activity," and it does not specify that the public must previously be unaware of the illegal activity.

--------

[18]The Defendant also has presented other evidence refuting the Plaintiff's belief of criminal activity, such as the fact that Dr. Emison consulted with other personnel and the County attorney before agreeing to the sabbatical, that several employees thought the sabbatical was beneficial as part of the County's "bio-preparedness plan," and the finding of no criminal fraud by the local district attorney.  While this evidence may be considered by a jury, the question before the Court at this stage of the litigation is whether the Plaintiff has presented a genuine issue of fact when given the benefit of all reasonable inferences.  Matsushita, 475 U.S. at 587; Celotex, 477 U.S. at 324.

[19]The Plaintiff also contends that she had reasonable cause to believe the illegal activities of theft and suppression of First Amendment speech had been committed.  (D.E. 26, Pl.'s Mem. of law, at 21.)  First, the evidence presented does not support a reasonable belief that theft occurred.  See Tenn. Code Ann. § 39-14-103 ("A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent.").  Second, it is circular to argue that a claim arises from the report of illegal activity, which constitutes attempts by the defendant to suppress the act of reporting itself.

Tenn. Code Ann. § 50-1-304(b).  The Tennessee Supreme Court has interpreted this language as granting employees "the absolute right to speak out about illegal activities in their workplaces." Mason, 942 S.W.2d at 476.  Additionally, the four elements required to establish a prima facie case under the whistleblowing statute, as articulated by courts, do not include a requirement that the reported information be unknown or derived from a confidential relationship associated with employment.  See, e.g., Wooley, 209 F. Supp. 2d at 845; Griggs,  909 F. Supp. at 1063.

In this case, the Court need not answer the legal question posed by the County because the Plaintiff has presented evidence that, even though the disputed activities within the Health Department had been discussed in the media prior to her alleged whistleblowing, the information she supplied was different from that available to the general public.  The comptroller's report was fixed in a specific point in time.  It revealed that the Health Department was allowing one of its employees to take a sabbatical without authorization from the County Commission, as of the time of the audit.  Although Rowell was not responsible for originally putting this information in view of the public eye, she later reported that the sabbatical policy continued after the audit findings had been released.  If calling attention to illegal activity is whistleblowing, then reporting continued violations would likewise fall within the scope of the statute.  Specifically, Rowell stated that she told her father and two other County commissioners about the sabbatical agreement.  (D.E. 26, Rowell affid., at ¶ 11.)  This evidence tends to establish that she reported what she considered to be ongoing violations of state law, occurring after the comptroller's audit findings.  Therefore, even taking as true the Defendant's assertion that reporting of non-public information to an outside source is required under the statute, the Plaintiff has presented evidence from which a reasonable juror could find that she, in fact, "blew the whistle" to public officials about continuing violations.

26

C.       Sole Causation

The County avers that Rowell cannot establish an exclusive causal connection between her whistleblowing activities and her termination.  Wooley, 209 F. Supp. 2d at 845.  It argues that the decision to lay off Rowell was motivated, at least partially, by the need to reduce the Health Department's annual budget proposal.  The Plaintiff does not dispute that the Health Department needed to trim its budget, but she contends that the only reason her position was selected for elimination was because of her whistleblowing activity.  In other words, she asserts that the Defendant's reliance on the budget cuts was entirely a pretextual excuse.

In a departure from the common law claim of retaliatory discharge, Tennessee's whistleblower statute requires that a plaintiff's protected activity be the sole cause of–rather than merely a substantial factor in–the decision to fire.  See Guy, 79 S.W.3d at 537 (observing that the TPPA "increases the burden of proof to require the plaintiff to demonstrate that his whistleblowing behavior was the sole reason for his termination, in contrast with the 'substantial factor' requirement of the common law").  The issue of causation is primarily a question of the employer's motivation.  Mason, 942 S.W.2d at 474.  Because of the heightened requirement of exclusivity, if the decision to terminate the Plaintiff was formed from her employer's desire to "kill two birds with one stone" by using lay offs to reduce the budget request and purge the department of dissenters simultaneously, sole causation would not be established.  If, on the other hand, the Defendant independently resolved to fire Rowell, and blaming the annual budget request was merely an expedient cover or an after-the-fact justification, then the exclusive causation requirement could be satisfied.  As the Tennessee Supreme Court has observed, direct evidence of "motivation is largely within the possession of the defendants."  Id.  Thus, the Plaintiff must establish causation by

27

presenting circumstantial evidence that provides a window into the employer's state of mind at the time of the firings.

In an effort to show that her lay off was solely motivated by her whistleblowing activity, Rowell relies on much of the same evidence that she used to establish causation for her § 1983 claim.  See supra at section I.C.  The Court agrees that, in considering the cumulative effect of this evidence, a reasonable juror could determine that Rowell was fired solely because she blew the whistle.  For example, Dr. Emison's statement at the April 20 staff meeting–that anyone who disagreed with the sabbatical could resign–might be reasonably interpreted as a present intention to exercise his official powers to defend his authority by terminating dissenters.  Also, Dr. Emison's instructions for his supervisors to fire complaining employees could give rise to a reasonable inference that he formed the intent to fire whistleblowers before learning of the need to reduce the budget.  (D.E. 26, Broyles affid., at ¶ 4; Medlin affid., at ¶ 13; see also Argo depo, at 45-46 (stating that a meeting was held with Hayes and Dr. Emison around June 20 at which the budget shortfall was discussed).)  Additionally, his comment about some County commissioners being on a "witch hunt" could be interpreted as knowledge, or at least suspicion, of Rowell's complaints to public officials.  (D.E. 26, Medlin affid., at ¶ 10.)  Permissible inferences also may be draw from the close temporal proximity.  Cf. Allen v McPhee, 240 S.W.3d 803, 823 (Tenn. 2007) (stating that, in claims involving violation of the Tennessee Human Rights Act, "close temporal proximity of a complaint and a materially adverse action are sufficient to establish a prima facie case of causation").  From this evidence, the Court finds that Rowell has shown genuine issues of material fact as to causation, as well as other elements of her claims under the TPPA.

III.      Public Employee Political Freedom Act Claims

28

The TPEPFA states:

(a) It is unlawful for any public employer to discipline, threaten to discipline or otherwise discriminate against an employee because such employee exercised that employee's right to communicate with an elected public official.

(b) If the court of competent jurisdiction determines that a public employer has disciplined, threatened to discipline or otherwise discriminated against an employee because such employee exercised the rights provided by this part, such employee shall be entitled to treble damages plus reasonable attorney fees.

Tenn. Code Ann. § 8-50-603. Few Tennessee courts have discussed causes of action arising from this statute,[20] but the cases available focus on the element of causation. Most recently in Gooch v. City of Pulaski, No. M2006-00451-COA-R3-CV, 2007 WL 969398, 2007 Tenn. App. LEXIS 181, at *17 (Tenn. Ct. App. Mar. 30, 2007), the Tennessee Court of Appeals, by drawing an analogy to the THRA, determined that "the legislature intended that plaintiff bear the burden . . . to show that the communication with an elected public official was a substantial or motivating factor in the discriminatory action taken by the employer."

The Defendant argues that Rowell cannot establish a TPEPFA claim because she has not shown "that any communication [she] had with an elected public official was even known by Dr. Emison or any other decision maker in the Health Department." (D.E. 22, Def.'s Mot. for S.J., at

---

[20]The Court has found only one reported case addressing the TPEPFA. Sloan v. State, 670 S.W.2d 227 (Tenn. Ct. App. 1984). Though several unreported cases discuss the requirement of showing causation, no decision outlines the specific elements of a TPEPFA claim. Considering that the TPEPFA also serves to protect First Amendment rights in the employment context, the elements would probably resemble those for a TPPA claim. Thus, for a TPEPFA cause of action, a plaintiff must show: (1) the plaintiff's status as an employee of the defendant; (2) the plaintiff communicated with an elected official; (3) the employer disciplined, threatened to discipline, or otherwise took an adverse action against the employee; and (4) communication with an elected public official was a substantial or motivating factor in the adverse action taken by the employer. See Gooch, 2007 Tenn. App. LEXIS 181, at *17; cf. Wooley, 209 F. Supp. 2d at 845 (articulating four elements for a TPPA claim).

25.)  To the contrary, the Plaintiff presented evidence, in the form of an affidavit by Medlin, that Dr. Emison stated that certain County commissioners "were on a witch hunt and not supportive of the Health Department."  Additionally, at the June 22 meeting about personnel cuts, Dr. Emison's wife commented that Rowell and others had been speaking out to County commissioners.  Considering that both of these incidents occurred while Rowell was employed with the Health Department, this evidence creates a genuine factual question as to whether the Plaintiff's contact with the County commissioners substantially motivated her termination.  Thus, the Defendant is not entitled to summary judgment on this claim.

IV.     Sex Discrimination Claims Under the THRA

Tennessee Code Annotated section 4-21-401 states that an employer commits a discriminatory practice when discharging "any person or otherwise . . . discriminat[ing] against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's . . . sex . . . ."  "Any person injured by any act in violation of the provisions of" the THRA has a civil cause of action.  Tenn. Code Ann. § 4-21-311(a).  With only a few exceptions, THRA claims are analyzed in the same manner as Title VII claims.  As the Tennessee Supreme Court has noted, "[a]lthough the language differs slightly, it is clear that the legislature intended the THRA to be coextensive with federal law.  [Courts], therefore, may look to federal interpretation of Title VII for guidance in enforcing [Tennessee's] anti-discrimination statute."  Phillips v. Interstate Hotels Corp. No. L07, 974 S.W.2d 680, 683-84 (Tenn. 1998) (internal citation omitted); see also Reed v. Cracker Barrel Old Country Store, Inc., 133 F. Supp. 2d 1055, 1075-76 (M.D. Tenn. 2000).  Thus, even though Rowell's THRA claim is based entirely in state law, the Court will also refer to the more extensive body of Title VII precedent in its analysis, unless the Tennessee courts

have indicated a divergence with federal law.

Sex discrimination may be proven through either direct or circumstantial evidence. Abdulnour v. Campbell Soup Supply Co., 502 F.3d 496, 501 (6th Cir. 2007). Because the Plaintiff's argument relies upon circumstantial evidence of discrimination, the Court will analyze her claim under the McDonnell Douglas burden-shifting approach. Clay v. United Parcel Serv., Inc., 501 F.3d 695, 703 (6th Cir. 2007); see also Wilson v. Rubin, 104 S.W.3d 39, 50 (Tenn. Ct. App. 2002) (noting that "Tennessee courts regularly employ the McDonnell Douglas approach in discrimination cases"). Under that approach, a plaintiff traditionally establishes a prima facie case by showing the following: "(1) she was a member of a protected class; (2) she was discharged; (3) she was qualified for the position; and (4) she was replaced by a person outside the class." Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992). Because Rowell frames her argument in terms of a reduction in force, however, she need not prove the fourth prong, in this precise form, because she was not actually replaced.[21] Godfredson v. Hess & Clark, Inc., 173 F.3d 365, 371 (6th Cir. 1999). Instead,

---

[21]The Sixth Circuit has explained that a reduction in force "occurs when business considerations cause an employer to eliminate one or more positions within the company," and the eliminated employees are not replaced after their discharge. Barnes v. GenCorp Inc., 896 F.2d 1457, 1465 (6th Cir. 1990). When the employer hires no replacement, a plaintiff could never prove the fourth element of her prima facie case. The Sixth Circuit has noted, however, that burden-shifting analysis under Title VII merely provides, "various context-dependent ways by which plaintiffs may establish a prima facie case, and not rigid requirements that all plaintiffs with similar claims must meet regardless of context." Blair v. Henry Filters, Inc., 505 F.3d 517, 529 (6th Cir. 2007) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 n.13, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). In considering summary judgment motions on Title VII claims, the key determination is always whether the plaintiff has presented "sufficient evidence to permit a reasonable jury to conclude that he or she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination." Id. (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); De Brow v. Century 21 Great Lakes, 620 N.W.2d 836, 838 n.8 (Mich. 2001)). Thus, both the Supreme Court and the Sixth Circuit have articulated several alternative ways in which a plaintiff can satisfy the fourth element of the prima facie case, including the exception for reductions in force.

the Sixth Circuit has substituted this element with a requirement that the Plaintiff present "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out [the Plaintiff] for discharge for impermissible reasons."  Id. (quoting Scott v. Goodyear Tire & Rubber Co., 160 F.3d 1121, 1126 (6th Cir. 1998)).

If Rowell successfully establishes a prima facie case, the burden shifts to the Defendant to provide a legitimate, non-discriminatory reason for its employment decision.  Abdulnour, 502 F.3d at 502.  If the Defendant meets its "burden of articulation," the Plaintiff must come forward with evidence to show that the Defendant's proffered reasons were merely pretextual.  Id.  Pretext may be demonstrated by showing that the articulated reasons "(1) had no basis in fact, (2) . . . did not actually [motivate the adverse action taken against her], or (3) . . . were insufficient to motivate [the adverse action taken against her]."  McClain v. Nw. Cmty. Corr. Ctr. Judicial Corr. Bd., 440 F.3d 320, 332 (6th Cir. 2006) (quoting Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994)) (alternations in original).  "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the McDonnell Douglas inquiry."  Clay, 501 F.3d at 703.

The parties agree that the Plaintiff can establish the first three elements of the prima facie case.  The Defendant argues, however, that Rowell has failed to present "additional direct, circumstantial, or statistical evidence" indicating that she was singled out for termination because she was female.  Godfredson, 173 F.3d at 371.  In an attempt to establish the fourth prong, Rowell points to eight categories of factual evidence, which she claims show the following points about the Defendant's decision to terminate her: (1) officials did not follow objective policy in the handbook;

---

Id.

(2) they did not consult other supervisors; (3) they did not apply objective business judgments; (4) Hayes's attempt to "zero out the contracts that were over budget" was done inconsistently; (5) officials held a "secret" meeting to discuss layoffs; (6) Lewis was not laid off even though he was on sabbatical; (7) some members of the staff received raises; (8) nurse positions were "revenue-generating."[22]

Even when assuming all these allegations are true, the Court does not find a genuine issue of fact with regard to whether sex discrimination motivated the Plaintiff's termination.  Seven of Rowell's eight points do not even implicate her female status.  For example, the mere fact that an employer failed to follow certain written policies or held a secret meeting does not indicate discriminatory motivation.  Arguably, these facts show arbitrariness in the employer's decision-making process, but not gender bias or prejudice.  Tennessee follows the employment-at-will doctrine, which means that an employee contracted for an indefinite term can be fired for an arbitrary reason or no reason at all, so long as it does not violate a statute or contravene "well-defined and established public policy." Guy, 79 S.W.3d at 534-35 (citing Chism v. Mid-South Milling Co., 762 S.W.2d 552, 555 (Tenn. 1988)).  Moreover, the THRA does not restrict an employer's ability to fire for reasons not motivated by an employee's "race, creed, color, religion, sex, age or national origin." Tenn. Code Ann. § 4-21-401.  In short, evidence of arbitrariness in the employment decision, without some indication that sex was a motivating factor, does not establish discriminatory intent.

---

[22]The Court does not suggest that Rowell has established all of these points through evidence in the record.  Although, for the sake of argument, it will consider whether the Plaintiff's assertions, if supported by proof, would satisfy the fourth prong of her prima facie case.

The lone fact presented by the Plaintiff that arguably may evoke gender considerations would be that Lewis, who is male, was not laid off.  The Sixth Circuit has stated that a plaintiff may establish the fourth element of a prima facie case by showing that "a comparable non-protected person was treated better."  Mitchell, 964 F.2d at 582.  In order the rely on this argument, however, Rowell must show that the comparable male employee was similarly situated "in all of the relevant aspects."  Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998).  Whether certain employment aspects are considered relevant depends on the specific circumstances of each case.  Barry v. Noble Metal Processing, Inc., 276 Fed. App'x 477, 480 (6th Cir. 2008).  Lewis's title at the Health Department was "environmental program director," though he was attending college to obtain a nursing degree.  The Plaintiff was a public health nurse working under a different supervisor than Lewis.  Rowell has offered no evidence suggesting that she possessed the training or expertise to be qualified for the position of environmental program director.  Aside from working at the Health Department with Lewis, her evidence indicates only negligible similarities between her position and his.  Considering the lack of evidence that Lewis was similarly situated, Rowell has failed to satisfy the fourth element of the prima facie case.  The mere fact that she can point to a single male employee who was not terminated, without establishing that he was in a similar position, is insufficient to create a genuine issue of fact as to whether her discharge was motivated by sex.  Thus, the Defendant is entitled to summary judgment on the Plaintiff's sex discrimination claims under the THRA.

## CONCLUSION

For the reasons articulated herein, the Court **GRANTS** the Defendant's motion for summary

judgment as to the Plaintiff's sex discrimination claim under the THRA, but **DENIES** the Defendant's motion as to all other claims.

      IT IS SO ORDERED this 2nd day of July, 2009.

                                    s/ J. DANIEL BREEN
                                    UNITED STATES DISTRICT JUDGE